**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**RAY QUIROZ,**

> **Plaintiff,**

**vs.**                                             **No CIV 09-311 MCA/CEG**

**COUNTY OF EDDY AND ITS BOARD OF
COUNTY COMMISSIONERS; et al.,**

> **Defendants.**

**PROPOSED FINDING AND RECOMMENDED DISPOSITION**

**THIS MATTER** is before the Court on *Defendants' Motion for Summary Judgment*

('Motion') (Doc. 68), *Plaintiff's Response to Defendants' Motion for Summary Judgment*,

('Response') (Doc. 71), *Defendants' Reply in Support of Motion for Summary Judgment*,

('Reply') (Doc. 72), and *Plaintiff's Surreply to Defendants' Reply in Support of Motion for

Summary Judgment*, ('Surreply') (Doc. 76). Plaintiff contends that he was subjected to cruel

and unusual punishment while incarcerated at the Eddy County Detention Center because

he did not receive adequate medical care. (Doc. 1-1 at 2-6). Defendants contend that they

are entitled to judgment as a matter of law. (Doc. 68).  The Court, having considered the

parties' submissions, the relevant law, and otherwise being fully advised in the matter,

**FINDS** that there are material issues of fact in dispute. Therefore, the Court

**RECOMMENDS** that the Motion be **GRANTED IN PART AND DENIED IN PART**.

> **I.     Background**

Plaintiff was incarcerated at the Eddy Count Detention Center on January 6, 2006,

after being charged with several crimes, including violating the terms of his probation. (*See*

Doc. 68-1 at 3). Plaintiff remained a pre-trial detainee at the Eddy County Detention Center

until his conviction in March of 2006. (*Id.*). On the morning of February 15, 2006, Plaintiff woke up and discovered what appeared to be an insect bite of some kind on the middle toe of his left foot. (*See* Doc. 71-1 at 2). The toe was, red, swollen, painful to the touch, and there appeared to be a hole at the top of the toe. (*Id.*). Plaintiff requested immediate medical aid and Todd Bannister, a registered nurse at the Detention Center, treated Plaintiff's foot that same day. (*Id.*; Doc. 68-3 at 3-4). Bannister claims that he gave Plaintiff a topical antibiotic cream, a claim that Plaintiff disputes. (*See Id.*; Doc. 71-1 at 2). Both parties agree, however, that Bannister arranged for Plaintiff to receive a prescription for Bactrim, an oral antibiotic that was to be taken twice a day. (Doc. 68-3 at 4; Doc. 71-1 at 2). In Nurse Bannister's opinion, a course of Bactrim is successful in treating similar infections 95% of the time. (Doc. 68-3 at 5). Bannister did not provide any further medical treatment on the 15th. (Doc. 68-3 at 4).

Nurse Bannister claims that he continued to monitor Plaintiff over the next two days and that the toe "wasn't any better or worse; it was just about the same.". (*Id.* at 6). Mr. Quiroz claims that Nurse Bannister did not monitor the toe every day and that he did not see Nurse Bannister again until two days after their initial meeting. (Doc. 71-1 at 4).[1] More importantly, Mr. Quiroz disagrees with Bannister's assertions that the toe did not get any better or worse over those two days. Mr. Quiroz claims that his condition continued to worsen dramatically over the next two days. Mr. Quiroz claims that the pain and swelling increased to the point where he was in agony and he was unable to stand or walk around.

---

[1] Nurse Bannister's 'Nurse Notes' seem to bear out Mr. Quiroz' contention that he was not seen by Nurse Bannister for two days after their initial meeting. The notes have a notation for February 15th, 2006, wherein Nurse Bannister wrote that Mr. Quiroz "has a spot" on his middle left toe. (Doc. 68-3 at 7). The next entry in the notes is dated February 17th. (*Id.*).

2

(Doc. 71-1 at 2-5). The wound in his toe began to emit puss and appeared to be badly infected and Mr. Quiroz developed a fever. (*Id.* at 4-5). It does appear that the jail staff thought the toe infection was severe enough to lock Mr. Quiroz in his cell over the next few days as a security measure to prevent other inmates from preying on Mr. Quiroz. (*Id.* at 3-4; Doc. 68-3 at 6).[2] Mr. Quiroz states that he made multiple and increasingly frequent requests for medical attention during those two days but that his complaints were either ignored or met with derision from prison guards. (Doc. 71-1 at 3-4, 6).

Over the course of the next two days, both parties agree that Mr. Quiroz's relationship with both prison guards and Nurse Bannister became more contentious. On February 17th, two days after the bite, Plaintiff got into a dispute with a prison guard named Jack Serabia. (*Id.* at 3; Doc. 68-1 at 7). Plaintiff claims that he cussed out Officer Serabia after the officer kept laughing at Mr. Quiroz' repeated requests for pain medication. (Doc. 71-1 at 3). Following this interaction, Officer Serabia filled out an 'Inmate Offense Form" charging Mr. Quiroz with making threats to an officer. (*Id.*). Officer Serabia's report states that Mr. Quiroz became verbally abusive for no reason whatsoever, "Mr. Quiroz . . . started cussing me for no reason. He continued to cuss saying things like Fuck you, you piece of shit, Fuck you and your mother over and over . . .". (*See* Doc. 68-1 at 7).

As a result of the incident with Officer Serabia, Sergeant Bea Denninger arrived at Plaintiff's cell later that morning and she ordered him to move out of his cell. (Doc. 71-1 at 2). Plaintiff claims that Sgt. Denninger 'tricked' him into leaving his cell by promising that he was being taken to see a doctor. (*Id.*). In fact Sgt. Denninger escorted Plaintiff to an

---

[2] Nurse Bannister could not precisely recall whether Mr. Quiroz' cell was locked down in order to protect him from other prisoners, or whether the lock down was due to the potentially infectious nature of Mr. Quiroz' condition. (*See* Doc. 68-3 at 6).

isolated padded 'rubber room,' which is presumably used to isolate violent prisoners. (Doc. 68 at 10; Doc. 72 at 4-5). Mr. Quiroz requested that he be transported out of his cell in a wheelchair because the condition of his foot made walking unbearable, but Sgt. Denninger refused to consider this request. (Doc. 71-1 at 2-3). When Mr. Quiroz told her that he was in too much pain to walk, she purportedly threatened to mace him with pepper spray. (*Id.*).

Mr. Quiroz remained in the padded cell for five to seven hours. During that time he was feverish from the infection in his toe and he experienced a severe bout of diarrhea. (*Id.* at 4). Mr. Quiroz defecated on himself, with some of the effluvia mixing into the wound on his toe. (*Id.*). Mr. Quiroz complained about his condition in the padded cell but Sgt. Denninger and the other guards ignored him. (*Id.*). Finally Mr. Quiroz got the attention of a nurse named Rhonda Bryant, and Nurse Bryant ordered the guards to remove Mr. Quiroz from the padded cell so that he could clean himself up. (*Id.*). Shortly after being moved out of the padded cell, Nurse Bannister inspected the toe, took photographs, but provided no further treatment. (*Id.* at 4-5). Mr. Quiroz told Nurse Bannister that he was in excruciating pain and that he needed to go to the hospital. Mr. Quiroz claims that Nurse Bannister replied that he was a medical professional and that he knew what he was doing. (*Id.*). Nurse Bannister did prescribe a couple of Advil for the pain, which only infuriated Mr. Quiroz further. (*Id.*).

Mr. Quiroz' toe continued to deteriorate over the next day and a half and Mr. Quiroz continuously pled with prison guards and staff to take him to a hospital. (*Id.* at 5-6). Mr. Quiroz begged two prison guards, Officer Funk and Officers Stearns, to help him. (*Id.*). The officers looked at the toe and Mr. Quiroz recalls that one of the officers exclaimed "[m]an it's getting worse. It's getting worse." (Doc. 71-1 at 6). Mr. Quiroz states that "[b]y this time

4

you could tell the toe was dead. It was already dangling down; purple, black . . .". (*Id.*). Nurse Bannister was called down. He again took pictures of the toe, but didn't offer any further treatment. (*Id.*). Mr. Quiroz cursed at Nurse Bannister because he was not being taken to a hospital and Mr. Quiroz claims that Nurse Bannister became frustrated and stated "[y]ou know what? I'm not even going to treat you. You can forget about me treating you." (*Id.*). Defendants deny that Nurse Bannister made any such statement. (Doc. 72 at 2).

By the morning of the 19th, Mr. Quiroz' toe appeared to have deteriorated further. Both parties agree that Mr. Quiroz was taken to the Carlsbad Medical Center that day because of the toe's condition. However, the parties disagree as to who authorized Mr. Quiroz' transportation. Defendants claim that Nurse Bannister decided to send Mr. Quiroz to the emergency room because the toe did not appear to be responding to the Bactrim and was in fact getting worse. (Doc. 68-3 at 6). Nurse Bannister's 'Nurse Notes' do have a notation from February 19th, 2006, wherein Nurse Bannister wrote, "Mr. Quiroz' toe and foot not doing any better, slightly more swelling, will send [him] to E.R." (Doc. 68-3 at 7). Mr. Quiroz, however, claims that several security guards, and not Nurse Bannister, decided to send him to the emergency room after he begged them for relief. (Doc. 71-1 at 6). Mr. Quiroz claims that on the 19th he spoke with Officers Stearns and Funk and he again asked them for help. (*Id.*). Mr. Quiroz claims that Officer Funk reacted with alarm when he saw the toe. (*Id.*).  Officer Funk and Stearns conferred quickly and they brought their supervisor, Lieutenant Barnes, to look at Mr. Quiroz' foot. (*Id.*). Lieutenant Barnes looked at the toe and immediately swore, "Oh, shit. Let me call an ambulance." (*Id.*). Lieutenant Barnes then arranged for Mr. Quiroz to be transported to the Carlsbad Medical Center.

5

Mr. Quiroz was treated by the physician on duty at the Carlsbad Medical Center on the 19th. (Doc. 68 at 3; Doc. 68-1 at 5). Mr. Quiroz was not admitted to the hospital and the attending physician merely dressed and cleaned the wound in Mr. Quiroz' toe. (Doc. 68 at 9; Doc. 68-1 at 5). However, the treating physician did schedule an appointment for Mr. Quiroz to see Dr. Baggs, an orthopedic surgeon, the next morning. (Doc. 68-1 at 5). Mr. Quiroz met with Dr. Baggs then next day and Dr. Baggs determined that the toe needed to be amputated. (Doc. 68 at 3; Doc. 68-1 at 6). The toe was successfully amputated on February 21st. (Doc. 68-1 at 6).

Mr. Quiroz claims that his mistreatment continued following the amputations. Specifically, Mr. Quiroz complains that the Detention Center consistently denied him access to a walker or a cane that was prescribed by the surgeon. (Doc. 1-1 at 6; Doc. 71-1 at 8). The walker or cane was supposed to help Mr. Quiroz move around following the surgery. Mr. Quiroz was forced to take showers and move around without the aid of the cane or walker, causing him to fall and hit his head several times. (Doc. 71-1 at 8). Mr. Quiroz admitted that the Detention Center explained to him that they could not provide him with a walker or a cane because those implements could be used as weapons. (Doc. 68-2 at 5). Mr. Quiroz further contends that "[d]uring the period after the amputation, Nurse Bannister began to verbally abuse and taunt [Plaintiff] by stopping at his cell and yelling, 'What's up, punk!?' or 'How do you like me now!?' or 'Kiss my ass, punk!'" (Doc. 1-1 at 6). Plaintiff's original complaint concludes by stating that Mr. Quiroz "endured four weeks of . . . heinous treatment while undergoing intravenous antibiotic treatment in the Eddy County Jail while surrounded by hostile and indifferent persons." (*Id.*).

On March 2, 2009, Plaintiff filed a *pro se* complaint against the Defendants in the

Fifth Judicial District of New Mexico. (*See* Doc. 1-1 at 1). In his complaint, Plaintiff

sought damages for

> a) deprivation of right to adequate medical treatment that resulted in digital amputation on the Plaintiff's left foot . . . in violation of the due process clauses of the New Mexico Constitution, Article II, Section 18, and, U.S. Constitutional 5th and 14th Amendments; and

> b) the deliberate indifference shown to [Mr.] Quiroz's serious medical needs that resulted in the amputation, pain, suffering, and mental anguish in violation of the protection from cruel and unusual punishment clauses of the New Mexico Constitution, Article II, Section 13, and, the U.S. Constitution's 8th Amendment.

(*Id.*). Plaintiff sought $250,000.00 in compensatory damages "for the amputation caused

by the Defendants' deprivation of adequate medical treatment and the inadequate training

of the Eddy County Jail personnel in medical procedures." (Doc. 1 at 7). Plaintiff further

sought $750,000.00 in punitive damages "for the abuse and taunting of the Plaintiff and the

deliberate indifference shown by the Eddy County Jail . . . to Plaintiff's pain and suffering

. . . ." (*Id.*).

The Defendants removed Plaintiff's case to Federal District Court in March of 2009.

(Doc. 1). This Court construed Plaintiff's complaint as a request for damages pursuant to

42 U.S.C. § 1983 and the New Mexico Tort Claims Act. (*See* Doc. 15 at 3). The New

Mexico Tort Claims Act claims were ultimately dismissed with prejudice because they were

filed after the statute of limitations had passed. (*Id.* at 9-11; Doc. 16). Therefore, only

Plaintiff's 5th, 8th, and 14th Amendment claims pursuant to 42 U.S.C. § 1983 remain.

Following the dismissal of Plaintiff's state law claims, Plaintiff requested that the Court

appoint counsel to represent him. (*See* Doc. 17). This Court appointed counsel in

September of 2009 and Plaintiff has been represented since that time. (*See* Doc. 22).

7

## II.     Applicable Parties and Controlling Law

As an initial matter, the Court notes that the parties agree that several of Plaintiff's claims and several of the named defendants should be dismissed from this action. In his Complaint, Plaintiff alleged 5th, 8th, and 14th Amendment claims against multiple defendants. Defendants argue that those claims are duplicative. (Doc. 68 at 5, 12-14). Since all of Plaintiff's claims arise from a common nucleus of facts - the deprivation of medical care - Defendants argue that Plaintiff's claims should be construed exclusively under Eighth Amendment jurisprudence. (*Id.*); *See Albright v. Oliver*, 510 U.S. 266, 273 (1994) ("Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.") (citations and quotations omitted); *Oxendine v. Kaplan*, 241 F.3d 1272, 1275 (10th Cir. 2001). Plaintiff concurs with the Defendants assessment and agrees that the "claims stated under the Fifth and Fourteenth Amendments are either duplicative or inapposite to the actual facts of the case." (Doc. 71 at 4).

Defendants further argue that many of the named defendants should be dismissed because they are not proper parties to Plaintiff's lawsuit. In his Complaint, Plaintiff asserted claims against multiple defendants including, *inter alia*, the County of Eddy, the Board of County Commissioners for the County of Eddy ('Board'), the Eddy County Sheriff, the Eddy County Jail, the medical services provider for Eddy County Jail, the Municipality of Carlsbad, Carlsbad's City Manager, the Mayor of Carlsbad, Nurse Todd Bannister, and

Sergeant Bea Denninger. (Doc. 1-1 at 1; Doc. 68 at 5-6).[3] Defendants claim that the County of Eddy is not a proper defendant since, by state law, suits against a county must be directed against the board of county commissioners for that county. *See* NMSA 1978 § 4-46-1. Defendants also argue that suits against the Eddy County Jail, Eddy County Sheriff, and Eddy County Jail medical services provider are merely "alternative way[s] of trying to maintain a municipal liability claim against the Board of County Commissioners of the County of Eddy" and that those defendants should also be dismissed. (Doc. 68 at 6-7). Defendants contend that the only proper defendants in Mr. Quiroz' lawsuit are the Board of Commissioners for the County of Eddy, Todd Bannister, and Sgt. Bea Denninger. (*Id.*). Once again, Plaintiff agrees with the Defendants' assessment and does not oppose the dismissal of all defendants except the Board of Commissioners, Todd Bannister, and Bea Denninger. (*See* Doc. 71 at 4-5). For those reasons, this Court will only address Plaintiff's Eighth Amendment claims against those three defendants.

### III.    Standard of Review

#### A.    Summary Judgment

Summary judgment is appropriate only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact[.]" Fed.R.Civ.P. 56(c)(2). The party moving for summary judgment has the initial burden of establishing, through admissible evidence in the form of depositions, answers to interrogatories, admissions, affidavits or documentary evidence, that there is an absence of evidence to support the opposing party's case. *Celotex Corp. v. Catrett*, 477

---

[3] Plaintiff's appointed counsel voluntarily dismissed the claims against the Municipality of Carlsbad, the Carlsbad City Manager, and the Mayor of Carlsbad in November of 2009. (*See* Doc. 29)

U.S. 317, 325 (1986). If this burden is met, the party opposing summary judgment must come forward with specific facts, supported by admissible evidence, which demonstrate the presence of a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). Affidavits or other evidence offered by the nonmoving party must create a genuine issue for trial; viewing the evidence in the light most favorable to the nonmoving party. Although all facts are construed in favor of the nonmoving party, it is still Plaintiff's responsibility to "'go beyond the pleadings' and 'designate specific facts' so as to 'make a showing sufficient to establish the existence of an element essential to [his] case' in order to survive summary judgment." *Johnson v. Mullin*, 422 F.3d 1184, 1187 (10th Cir. 2005) (quoting *Celotex,* 477 U.S. at 322).

Furthermore, the Court liberally construes the filings Mr. Quiroz made while he was proceeding *pro se. Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). Nevertheless, a *pro se* non-moving party must still "identify specific facts that show the existence of a genuine issue of material fact." *Munoz v. St. Mary-Corwin Hospital,* 221F.3d 1160,1164 (10th Cir. 2000). Conclusory allegations are insufficient to establish an issue of fact that would defeat the motion.

With these standards in mind, the Court turns to the merits of the Defendants' Motion.

### III.   Analysis

#### A.     Nurse Todd Bannister Is Not Entitled To Summary Judgment

Plaintiff claims that Nurse Bannister deliberately disregarded Plaintiff's obvious medical needs when he refused or failed to send Plaintiff to a hospital until four days after a severe infection had already rendered his toe necrotic. Nurse Bannister claims that he

provided adequate treatment to Plaintiff and that Plaintiff has not alleged an actual violation of his Eighth Amendment rights. (Doc. 68 at 7-10). Because an Eighth Amendment claim involves both objective and subjective components, this Court will address both in turn.

### i.   **Objective Prong.**

A prison official's "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (citation omitted). The objective component of a 'deliberate indifference' claim is met if the deprivation is "sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). "A medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (citations omitted).

Because there is no dispute that Mr. Quiroz began receiving treatment on the day his toe first became infected, Mr. Quiroz' claim necessarily must allege that the delay in transporting Mr. Quiroz to a hospital resulted in substantial harm. *See, e.g.*, *Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000) ("Delay in medical care only constitutes an Eighth Amendment violation where the plaintiff can show that the delay resulted in substantial harm."); *Olson v. Stotts*, 9 F.3d 1475 (10th Cir. 1993) (same).

Bannister claims that there are no disputed facts which could suggest that he unnecessarily delayed transporting Plaintiff to the Carlsbad Medical Center or that the delay resulted in "substantial harm" to Plaintiff. (*See* Doc. 68 at 8-10; Doc. 72 at 1-4, 7-8). Bannister argues that he promptly started Plaintiff on antibiotics and that Plaintiff's condition was continuously monitored (Doc. 68 at 8-9; Doc. 72 at 8). Bannister also makes much of

the fact that the physician on duty at the Carlsbad Medical Center did no more than clean and dress the toe and make an appointment for Mr. Quiroz to see an orthopedic physician. (Doc. 72 at 8). In his view, because the physician "did not change any course of treatment, admit Plaintiff to the hospital or seek to take aggressive or invasive procedures to treat the toe," the four day delay in taking Plaintiff to the hospital cannot constitute "substantial harm." (*See* Doc. 68 at 10 ("Given that a trained physician did not . . . take any different or more aggressive steps than those taken by the medical personnel at the Detention Center, the Plaintiff can hardly claim that there was a delay in medical attention that resulted in substantial harm . . .")).

This Court finds that there are disputed issues of fact with regard to the objective prong of Mr. Quiroz' Eighth Amendment claim. Nurse Bannister claims that he treated Plaintiff's infection as he would any other infection and that Mr. Quiroz' toe "wasn't any better or worse; it was just about the same" after two days of treatment. (Doc. 68-3 at 6). Plaintiff has painted a far different picture of his condition over those two days. Plaintiff contends that his pain became far more severe over the next few days, that he developed a fever, that the toe began to ooze puss, and that by the third day "you could tell the toe was dead. It was already dangling down; purple, black . . .". (Doc. 71-1 at 6). Plaintiff further testified at his deposition that several prison guards became concerned about the condition of his toe in the days prior to his being sent to the hospital. (*See* Doc. 71-1 at 6 (testifying that Officer Stearns and Funk saw Plaintiff's toe on February 18th and they exclaimed "[m]an it's getting worse. It's getting worse")). Plaintiff states that Nurse Bannister was indifferent to the obviously worsening condition of the toe. Therefore, there seems to be a genuine issue of fact as to the worsening condition of Plaintiff's toe in the four days

12

between the initial injury and his transportation to the hospital. The Tenth Circuit has noted that a delay which results in a lifelong handicap or a permanent loss is sufficiently serious to satisfy the objective prong of an Eighth Amendment violation. *See, e.g.*, *Garrett v. Stratman,* 254 F.3d 946, 950 (10th Cir. 2001) ("The "substantial harm requirement may be satisfied by lifelong handicap, permanent loss, or considerable pain."); *Oxendine v. Kaplan*, 241 F.3d 1272, 1278 (10th Cir. 2001).

Furthermore, this Court does not agree that the actions of the physician at the Carlsbad Emergency Center establish that Bannister is entitled to summary judgment. Defendant essentially argues that, because the attending physician did not aggressively treat the toe as soon as he was brought to the hospital, the four day delay in transporting Plaintiff to the hospital did not cause Plaintiff any "substantial harm." However Defendant has introduced no evidence that the toe could not have been saved had Plaintiff been seen by a doctor at an earlier time, which is the Court's key concern in deciding whether, as a matter of law, the four day delay did not cause "substantial harm". *See, e.g.*, *Hill*, 40 F.3d at 1188 ("The "seriousness" of an inmate's medical needs may also be decided by reference to the *effect* of delay in treatment . . . [w]here the delay results in an inmate's suffering "a life-long handicap or permanent loss, the medical need is considered serious."") (emphasis in original).

It is true that the physician did not admit Plaintiff to the hospital and that he only cleaned and dressed the wound. However, the physician immediately made an appointment for Plaintiff to see an orthopedic physician the next day, wherein it was determined that Plaintiff's toe had to be amputated immediately. Therefore, the significance of the physician's actions is somewhat equivocal. Just as the physician's actions could

13

suggest that he found nothing wrong with Nurse Bannister's course of treatment, they could also suggest that the toe was so damaged by the time Mr. Quiroz got to hospital that the physician could do nothing more than clean the wound and arrange for an immediate appointment with an orthopedist. The defendants are asking the Court to speculate as to the physician's thinking when he declined to take any significant action with Plaintiff's toe other than to schedule the orthopedist appointment. This the Court may not do, especially when it is the Court's duty to view the facts and the reasonable inferences that may be drawn from those facts in the light most favorable to Mr. Quiroz. *Self v. Crum*, 439 F.3d 1227, 1235 (10th Cir. 2006) ("Summary judgment requires more than mere speculation. It requires some *evidence*, either direct or circumstantial . . .") (emphasis in original).

Bannister also argues that Plaintiff's counsel's own admissions show that he is entitled to summary judgment. Specifically, when filing an opposed motion to withdraw as counsel, Plaintiff's attorney stated "[c]ounsel has engaged in discovery and evaluation of the Eighth Amendment claim raised in Plaintiff's complaint. After such investigation, *including consultation with a medical expert*, it is counsel's professional judgment that an Eighth Amendment claim cannot be sustained on the merits." (Doc. 72 at 7, n. 4; Doc. 60 at 1) (emphasis in original). Bannister characterizes counsel's statement as an admission which entitles him to summary judgment. (Doc. 72 at 7, n. 4). Notwithstanding the possible breach of Plaintiff's counsel's ethical responsibility to his client, Plaintiff's counsel correctly notes that "certain situations justify a distinction between the statements of counsel made in the capacity of representation, and statements of counsel that are collateral and cannot bind a client." (Doc. 76 at 1-2). This is particularly true in situations where the attorney and client cannot agree on the strength of a case or the advisability of settling a case. *See, e.g.,*

14

*Michaud v. Michaud*, 932 F.2d 77, 81 (1st Cir. 1991); *Cravens v. Wilbros Butler Engineers, Inc.*, No. 94-5177, slip op. at 2 (10th Cir. 1995) (unpublished). Therefore, this Court does not consider counsel's statements with regard to the strength of Plaintiff's case to be dispositive in this matter.

Therefore, because this Court must construe all facts and inferences in favor of the non-moving party, the Court finds that Plaintiff has alleged sufficient disputed material facts such that Nurse Bannister is not entitled to summary judgment.

## ii.    <u>Subjective Prong</u>

The Tenth Circuit recently set out the standard for the subjective prong of the deliberate indifference test as follows:

> To prevail on the subjective component, the prisoner must show that the defendants knew he faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it. [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. Unlike the objective component, the symptoms displayed by the prisoner are relevant to the subjective component of deliberate indifference. The question is: "were the symptoms such that a prison employee knew the risk to the prisoner and chose (recklessly) to disregard it?"

*Martinez v. Beggs*, 563 F.3d 1082, 1089 (10th Cir. 2009)(internal citations omitted).

Nurse Bannister contends that he did not disregard any risk posed by Plaintiff's toe infection because he promptly began a course of antibiotics which, in his opinion, were effective at combating most infections. (Doc. 68 at 8-9; Doc. 72 at 9). Plaintiff does not dispute that antibiotics were prescribed. (Doc. 71 at 1-2). Rather, Plaintiff alleges that, as the infection continued to worsen and as his demands to be taken to the hospital became more insistent and abusive, Nurse Bannister decided to cease or delay treatment out of

spite. (*Id.* at 5-7). Plaintiff alleges that Bannister became frustrated after Plaintiff cussed him out for failing to take him to the hospital and he alleges that Bannister swore, "[y]ou know what? I'm not even going to treat you. You can forget about me treating you."(Doc. 71-1 at 6).

While Nurse Bannister denies ever threatening to deny treatment to Plaintiff, he argues that whether he made such a threat is immaterial since he did in fact continue to treat Plaintiff. (Doc. 72 at 9 ("While Bannister denies any such statements or animus, the record demonstrates that Bannister, or one of his subordinates, continued . . . treatment on a daily basis . . . [t]hus, Bannister's alleged animosity towards Plaintiff is immaterial; it did not result in any demonstrated denial or delay of care.")). This Court disagrees.

Because Mr. Quiroz alleges that Bannister purposefully delayed needed treatment, the key question for this Court is whether there are material disputed facts which, taken in the light most favorable to Mr. Quiroz, would enable a reasonable jury to find that Bannister delayed further treatment out of spite or animus towards Mr. Quiroz. *See, e.g. Craig v. Eberly*, 164 F.3d 490, 493 (10th Cit. 1998). The Court finds that Mr. Quiroz has indeed identified disputed material issues of fact regarding Bannister's motivation in waiting for four days before transporting Plaintiff to the hospital.

Plaintiff has alleged that Bannister became fed up with Plaintiff's incessant requests for further medical attention in the days following the initial injury to the toe. Specifically, Plaintiff alleges that Bannister decided to withhold or delay treatment after becoming frustrated with Plaintiff's abusive and incessant demands to be taken to a hospital. (Doc. 71-1 at 6). Bannister purportedly became so frustrated with Plaintiff that he delayed sending Plaintiff to the hospital and that it was Lieutenant Barnes and Officers Funk and

Stearns who ultimately had to authorize his transportation. (*Id.*). While Bannister denies every making those threatening statements to Mr. Quiroz, this is precisely the type of "he said, she said" dispute which cannot easily be resolved at the summary judgment stage. *See, e.g.*, *Fincher v. Depository Trust and Cleaning Corp.*, 604 F.3d 712, 726 (2nd Cir. 2010) ("Whether Fincher and Hudson had a private conversation in which Hudson made the remarks that Fincher imputes to him is a question of "he said, she said," on which the court cannot . . . take a side at the summary judgment stage."); *Russell v. Board of Trustees of University of Illinois at Chicago*, 243 F.3d 336, 340 (7th Cir. 2001) ("[S]ummary judgment is a singularly inappropriate time to resolve a "he said, she said" kind of dispute").

Furthermore, the Court notes that Plaintiff has alleged numerous facts in addition to the purported threat which, when taken in the light most favorable to the Plaintiff, support his contention that there is a triable issue of fact as to the motivations behind the delay in Plaintiff's transportation to the hospital. As discussed in the objective prong analysis of Mr. Quiroz' claim, there appears to be a genuine disagreement between Plaintiff and Bannister with regard to the condition of Mr. Quiroz' toe during the four days prior to the amputation. While Bannister claims that the toe was neither better or worse during those first few days, Plaintiff alleges in his deposition that the toe in fact became dramatically more swollen, pus-filled, and painful, and that it became necrotic during those days. (Doc. 71-1 at 6). Indeed, Plaintiff's toe was so badly damaged that a doctor determined it had to be amputated within a day of being brought to the hospital. (Doc. 68-1 at 6). Therefore the record does support the inference that proper treatment of his toe may have been delayed.

The evidence in the record also supports an inference that the delay in treatment was due to Nurse Bannister and other jail members becoming increasingly frustrated with

17

Plaintiff's repeated requests for medical aid or to be taken to a hospital. Plaintiff became increasingly combative and abusive with jail staff members during those days as his condition worsened and he felt as though the staff was not being responsive to his plight. (Doc. 71-1 at 5-6). For example, Plaintiff got into an altercation with Officer Serabia because Plaintiff felt that his medical needs were being ignored. (Doc. 71-1 at 3). Officer Serabia responded poorly to Plaintiff's verbal abuse and the altercation resulted in Plaintiff being moved to a padded cell where he was ignored for several hours despite a severe bout of diarrhea that caused feces to be mixed into Plaintiff's open wound. (Doc. 71-1 at 3; Doc. 68-1 at 7 ("[Mr. Quiroz] continued to cuss saying things like Fuck you, you piece of shit, fuck you and your mother over and over and yea [sic] I did tell him fuck you too, I'm only human. He also stated over [and] over come in my cell and I'm going to kick your fuckin ass. That he would kick my ass before this is all said and done with.")). Nurse Bannister also acknowledges that Plaintiff became belligerent and abusive towards him during this time. (Doc. 71-1 at 10). It was precisely this belligerent attitude which purportedly caused Bannister to exclaim that he was not going to treat Plaintiff anymore. (Doc. 71-1 at 5-6).

When considering all of these facts in the light most favorable to Plaintiff, this Court believes that Plaintiff has alleged sufficient disputed material facts such that a reasonable jury could find that Bannister intentionally delayed treating or transporting Plaintiff to the hospital out of frustration with Plaintiff's behavior. Therefore, Nurse Bannister is not entitled to summary judgment.

### B.    Nurse Bannister Is Not Entitled To Qualified Immunity

Bannister claims that he is entitled to qualified immunity because Plaintiff has not

met the two-part burden in establishing that 1) Bannister's actions violated Mr. Quiroz' constitutional rights and, 2) that those rights were clearly established at the time of the conduct at issue. (Doc. 68 at 14-16; Doc. 72 at 9-10). Plaintiff disagrees and states that he has established that Bannister violated his clearly established constitutional rights. (Doc. 71 at 10-11).

Review of summary judgment orders in the qualified immunity context differs from that applicable to review of other summary judgment decisions. *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Id.* (citations omitted). "Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). In determining whether the plaintiff has met his burden of establishing a constitutional violation, this Court must construe the facts in the light most favorable to the plaintiff as the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378, 380 (2007); *see also Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009) ("The plaintiff must demonstrate on the facts alleged both that the defendant violated his constitutional or statutory rights, and that the right was clearly established at the time of the alleged unlawful activity.")

In arguing that he is entitled to qualified immunity, Bannister makes the same arguments as those outlined in the summary judgment section. Namely, that Plaintiff has failed to establish a denial of a constitutional right because Bannister provided Plaintiff with medical care in the days leading up to the amputation of his toe. (Doc. 68 at 16). Bannister further argues that any complaint Plaintiff alleges with regard to Bannister's treatment only

constitutes "a difference of opinion concerning the appropriate treatment." (Doc. 72 at 9-10). Bannister notes that Tenth Circuit law has clearly established that a mere disagreement between a prisoner and a medical provider concerning the appropriate treatment is insufficient to establish an Eighth Amendment violation. (*Id.*); *See, e.g.*, *Fitzgerald v. Corrections Corp. of Am.*, 403 F.3d 1134, 1142 (10th Cir. 2005).

Plaintiff does not deny that Bannister provided some treatment in the days leading up to the amputation. Rather, he alleges that the constitutional violation was established when Bannister delayed sending Plaintiff to the hospital for several days out of spite and frustration. (Doc. 71 at 5-6, 10). Such an allegation goes beyond a "mere disagreement" regarding the proper course of treatment. *See, e.g.*, *Oxendine v. Kaplan*, 241 F.3d 1272, 1277 n.7 ("The government seems to find dispositive the fact that Oxendine received at least some treatment . . . during the time when he alleged that he received inadequate and delayed medical care . . . [however] the fact that he has seen numerous doctors [does] not necessarily mean that the received treatment for serious medical needs.") (quoting *Hunt v. Uphoff*, 199 F.3d at 1220, 1223-24 (10th Cir. 1999)). Indeed, plaintiff's counsel has aptly stated,

> [F]or the very same reasons that Plaintiff has a colorable Eighth Amendment claim that cannot be properly decided on summary judgment, Plaintiff has also stated a case for the violation of his Eighth Amendment rights. That Defendants happen to disagree with Plaintiff's recollection of events and testimony thereto is immaterial; a genuine dispute over material facts exists such that the case should proceed to trial and determination by a qualified finder of fact.

*Id.* at 10. In the Court's opinion, Plaintiff has made out the first prong of the qualified immunity test. Specifically, as outlined in the summary judgment section, Plaintiff has alleged sufficient facts that, when taken in the light most favorable to Plaintiff, establish that Bannister purposefully ignored Plaintiff's worsening medical condition, which is clearly a

violation of Plaintiff's constitutional rights.

With regard to the second prong of the qualified immunity test, there is no doubt that it is clearly established in the law that a medical provider may not act with deliberate indifference to a serious medical need of a prisoner. *See, e.g.*, *Farmer v. Brennan*, 511 U.S. 825, 835 (1994); *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005). This is true even if a prisoner has been abusive or disruptive because the denial of necessary medical care does not serve any penological purpose. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976) ("[D]enial of medical care may result in pain and suffering which no one suggests would serve an penological purpose."); *Mata*, 427 F.3d at 758. Therefore the Court finds that Plaintiff has shown that clearly established law prohibits the denial of necessary medical care.

## C.    Sgt. Bea Denninger Is Entitled To Summary Judgment

Plaintiff's complaint against Sgt. Denninger is based on the fact that she purportedly 'tricked' him into leaving his cell by promising him that he was being taken to see a doctor when in fact he was being moved to a padded isolation cell because of the altercation with Officer Serabia. (Doc 1-1 at 3; Doc. 71 at 8). Plaintiff further alleges that diarrhea caused him to defecate on himself while in the cell and that Sgt. Denninger ignored his request for medical attention or to be moved to a cell with toilet paper and a shower. (Doc. 1-1 at 3-4; Doc. 71 at 8-9). Sgt. Denninger contends that she had no medical training and was unaware of Plaintiff's medical condition and that she is therefore entitled to summary judgment. (Doc. 68 at 10-11).

### i. Moving Plaintiff Between Cells Did Not Violate The Eighth Amendment

Plaintiff has not proven a violation of the Eight Amendment because the allegations that he was forced to walk to the padded cell does not satisfy either the objective or subjective prong of a deliberate indifference claim. As stated above, the objective component of a 'deliberate indifference' claim is met if the deprivation is "sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). "A medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (citations omitted). Plaintiff has not established a violation of the objective prong because Sgt. Denninger did not deny plaintiff medical care by making him walk to the padded cell. While it may have been obvious that Plaintiff's toe required medical attention prior to his move to the padded cell, there is no evidence that making Plaintiff walk to the cell caused any substantial harm to Plaintiff's toe. Therefore, Plaintiff cannot claim that his transfer from one cell to the other objectively constitutes a violation of his constitutional rights.

Neither can Plaintiff establish the subjective prong of  his deliberate indifference claim. To establish a violation of the subjective prong, Plaintiff must prove that Sgt. Denninger "knew [Plaintiff] faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it." *Martinez v. Beggs*, 563 F.3d 1082, 1089 (10th Cir. 2009)(internal citations omitted). The cell transfer did not violate the Eighth Amendment because it was a disciplinary measure undertaken only after Plaintiff had

threatened Officer Serabia. (Doc. 68 at 10).[4] Corrections officers are entitled to take steps, including the use or threatened use of force to maintain or restore prison discipline. *See, e.g.*, *Sampley v. Ruettgers*, 704 F.2d 491, 495 (10th Cir. 1983).

### ii. Plaintiff's Treatment While In Isolation Did Not Violate The Eighth Amendment

Plaintiff asserts that Sgt. Denninger violated his constitutional rights when she deliberately ignored his pleas for help after he had defecated on himself in the isolation cell. (Doc. 1-1 at 3-4; Doc. 71 at 8-9). Sgt. Denninger replies that she was not a member of the medical team, that she was unaware of Plaintiff's condition, and that she did not consciously disregard an excessive risk to Plaintiff's health. (Doc. 68 at 11; Doc. 72 at 5). While a closer question than that posed by Plaintiff's transfer to the isolation cell, this Court finds that Plaintiff has not made out the objective prong of a deliberate indifference claim.

Plaintiff contends that Sgt. Denninger's actions delayed Plaintiff's access to medical treatment and that such actions satisfy the objective prong of a deliberate indifference claim. (Doc. 68 at 9 ("This set of facts constitutes a situation in which Defendant Denninger, a correctional officer, delayed the receipt of proper medical care for Plaintiff in violation of the standards set forth by the Eighth Amendment . . . [t]his satisfies the "objective" prong of the  Eighth Amendment analysis.")). This Court disagrees.

To establish the objective prong of an Eighth Amendment violation when the Plaintiff complains of a delay in the receipt of medical treatment, Plaintiff must show that the delay resulted in "substantial harm." *See, e.g.*, *Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000) ("Delay in medical care only constitutes an Eighth Amendment violation where

---

[4] Plaintiff does not dispute that his transfer to the padded cell was a disciplinary action taken in response to his fight with Officer Serabia. (Doc. 71 at 3).

the plaintiff can show that the delay resulted in substantial harm."); *Olson v. Stotts*, 9 F.3d 1475 (10th Cir. 1993) (same). "Not every twinge of pain suffered as the result of delay in medical care is actionable." *Sealock*, 218 F.3d at 1210. Plaintiff must show that "the substantial harm . . . [resulted] in lifelong handicap, permanent loss, or considerable pain." *Garrett v. Stratman,* 254 F.3d 946, 950 (10th Cir. 2001). Plaintiff has not shown that the time he spent in the isolated cell resulted in substantial harm.

Much like the analysis with regard to Nurse Bannister, the key question is whether the purported delay in medical treatment caused Plaintiff to lose his toe. While there was sufficient evidence in the record to find that the four day delay in transporting Plaintiff to the hospital resulted in the amputation of the toe, the Court cannot say the same with regard to the several hours he spent in the isolated cell. While Plaintiff spent several hours in the isolated cell on February 17th, he  was not taken to the hospital until two days later, when the toe appeared substantially worse. Indeed, it was not until February 18th that Plaintiff alleges that, "[b]y this time you could tell the toe was dead. It was already dangling down; purple, black . . .". (Doc. 71-1 at 6). Similarly, it was only in the days after Plaintiff was removed from the padded cell that Officers Stearns, Funk, and Lt. Barnes became markedly concerned with the condition of the toe. (*Id.*). Therefore, while the evidence in the record supports an inference that the entire four day delay caused Plaintiff to lose his toe, there is insufficient evidence to form the causal link between the several hour isolation on the 17th and the amputation of the toe several days later. *See, e.g.*, *Tafoya v. Salazar*, 516 F.3d 912 (10th Cir. 2008)

> Section 1983 requires proof of an affirmative causal connection between the actions taken by a particular person 'under the color of state law' and the constitutional deprivation . . . [t]he relevant inquiry is whether an official's acts were the cause - not merely a contributing factor - of the constitutionally infirm condition.

*Id.* at 922 (citations and quotations omitted). For that reason, the Court finds that Plaintiff has failed to establish the objective prong of a deliberate indifference claim against Sgt. Denninger.

Because the Court finds that Plaintiff has not alleged sufficient facts to establish the objective prong of a deliberate indifference claim, the Court need not determine whether Plaintiff has established the subjective prong, or whether Sgt. Denninger is entitled to qualified immunity. The Court therefore finds that Sgt. Denninger is entitled to summary judgment.

### E.    The Board Of County Commissioners For The County Of Eddy Is Entitled To Summary Judgment

To make out a claim of municipal liability for an Eighth Amendment violation, a Plaintiff must show, 1) that a county employee violated a plaintiff's constitutional rights and, 2) that there was a county custom or policy that was the moving force behind the constitutional violation. *Myers v. Oklahoma County Board of Commissioners*, 151 F.3d 1313, 1316 (10th Cir. 1998); *Jenkins v. Wood*, 81 F.3d 988, 993 (10th Cir. 1996). Defendants contend that Plaintiff has failed to allege any facts which would establish that the Board of Commissioners for the County of Eddy had any policy or custom which would have led Nurse Bannister to violate Plaintiff's constitutional rights. (Doc. 68 at 17-18). Plaintiff concedes that he has not made out any facts which would establish liability for the Board. (Doc. 71 at 5 ("Plaintiff concedes that municipal liability does not follow from the facts of this case as pled and developed.")).

Therefore, the Court finds that the Board of County Commissioners for the County of Eddy is entitled to summary judgment.

## IV.    Recommendation

For the reasons set forth in this Proposed Finding and Recommended Disposition, the Court recommends that Defendants' *Motion for Summary Judgment* ('Motion') (Doc. 68) be **GRANTED IN PART AND DENIED IN PART**. Specifically, the Court **RECOMMENDS** that,

1) Plaintiff's Fifth Amendment and 14th Amendment claims against all defendants be **DISMISSED WITH PREJUDICE**;

2) All claims against the County of Eddy, the Eddy County Sheriff, the Eddy County Jail, and the medical services provider for Eddy County Jail be **DISMISSED WITH PREJUDICE**;

3) Summary judgment be **DENIED** as to defendant Todd Bannister;

4) Summary judgment be **GRANTED** as to defendant Bea Denninger;

5) Summary judgment be **GRANTED** as to the Board of Commissioners for the County of Eddy.

---

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).  **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.**

_____
THE HONORABLE CARMEN E. GARZA
United States Magistrate Judge